UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

CLARENCE MARTIN *et al.*,

   Plaintiffs,

  v.              CAUSE NO. 3:20cv13 DRL

THOR MOTOR COACH,

   Defendant.

OPINION AND ORDER

This began a warranty case under the Magnuson Moss Warranty Act. Clarence and Terri Martin's initial warranty claim was dismissed as untimely. Their sole remaining UCC-based claim is that the written warranty's remedy failed its essential purpose. Thor requests summary judgment, and the Martins request a countervailing partial summary judgment. The court grants summary judgment for Thor.

BACKGROUND

On March 24, 2018, Clarence and Terri Martin purchased a 2018 Thor Hurricane motorhome from Poulsbo RV, a Thor dealer in Washington [34-1 at 5]. It had a limited warranty [10-1]. The warranty covered "defects in workmanship performed and/or materials used to assemble [] portions of [the] motorhome" for twelve months [*id.* 1]. Certain parts were excluded, including "leveling jacks" [*id.* 2].

The warranty included a repair remedy—a "sole and exclusive obligation is to repair any covered defects discovered within the warranty coverage period if: (1) within ten (10) days of your discovery of a defect you notify [Thor] or an authorized dealership of the defect; (2) AND you deliver your motorhome to [Thor] or an authorized dealership (at your expense)" [*id.* 3].

The warranty also included a backup cure. "If the primary repair remedy fails to successfully cure any defect after a reasonable number of repair attempts, your sole and exclusive remedy shall be to have [Thor] pay an independent service shop of your choice to perform repairs to the defect OR if the defect

is incurable, have [Thor] pay diminished value damages. The repair remedy and the back-up remedy **MUST** both be exhausted **AND** these remedies must fail to fulfill their essential purpose before you can seek other legal or equitable remedies for breach of this express warranty or for breach of any implied warranty" [*id.* 3].Together the primary repair right and backup cure worked as the warranty's remedy.

The Martins claim a defect in the motorhome's leveling system caused the warranty's remedy to fail its essential purpose. The leveling system in the motorhome was a Lippert Electronic Leveling System [86-11]. The leveling system has many components, including four independent jacks, valves that control the fluid going to the jacks, hoses, electronic components, a sensor, control pad, the power unit harness, the directional valve, the manifold, the presser switch, the quick disconnect, and the retract fitting [86-7 at 12-15]. The Lippert owner's manual for the system lists three "major components," including the Lippert jacks, each powered from a central motor/pump assembly, and the electronic touchpad at the driver's seat [86-11 PDF 5]. Some in the recreational vehicle industry use the terms "leveling jack" and "leveling system" interchangeably [81-1 ¶ 6; 88-1 ¶ 4].

The Thor owner's manual defines leveling jack as a "jack lowered from the underside of motorhomes for the purpose of leveling the vehicle" and one "designed to bear a significant portion of the RV's weight" [86-12]. It also includes various warnings about the leveling system and jacks: "Do not use the jacks to change the tires. The system is designed for leveling and stabilizing, and is not meant to lift all the wheels off the ground!" and "Make sure there are no obstructions in the 'extend' or 'retract' paths of the jacks. Keep all people and pets clear of the motorhome while operating the leveling system. Always visually confirm the jacks have fully retracted before moving the motorhome. Moving the motorhome while the jacks are extended could cause damage to the jack system and the motorhome." [86-10 PDF 2-3 (emphases omitted)].

During a pre-delivery inspection in late March or early April 2018, Poulsbo noted that the auto leveling jacks were not level and needed to be reprogrammed [86-3 PDF 2]. The repair order used the

code "602"—the code used to indicate that this was covered by Thor's warranty [86-6 at 31-32]. On April 7, the Martins took possession of the recreational vehicle [10-2 at 4; 81-2 PDF 84].

On April 19, 2018, the Martins took it on their first outing [81-2 PDF 84]. They discovered an issue with the leveling system when the control panel lost power [*id.*]. They notified Poulsbo that day who advised them to call a mobile technician [*id.*; 86-2 PDF 4]. The mobile technician, Convenience RV, was only able to raise the jacks manually so that the Martins could move the unit [*id.*]. Mr. Martin reached out to Thor for reimbursement of Convenience RV's work, which Thor agreed to pay [86-2]. Thor completed a form for reimbursement [86-2 PDF 2]. Under "warranty type," Thor indicated that the customer complaint was that "jacks stuck in the extended position," the cause was the "control panel getting power but not reacting" and the correction was "manually raised the jacks so the customer can get to a dealer for repair" [86-2 at 2].

On May 3 that year, the Martins brought the unit to Poulsbo for a leveling system inspection and repair [81-2 PDF 84]. Poulsbo could not get the leveling system to fail and said everything was working fine [*id.*]. Mr. Martin asked them to do a diagnosis on the leveling system [*id.*]. A May 22 repair order said Poulsbo tested the leveling system, found it was out of calibration, and recalibrated it [86-13 at 2]. It charged the Martins $210 for the leveling system work [*id.*]. Thor declined to pay for the service [81-2 PDF 84]. On June 16, 2018, the Martins picked up the motorhome from Poulsbo [*id.*].

Over the July 4 holiday, the leveling system again malfunctioned [*id.* PDF 85]. On July 26, the Martins brought the recreational vehicle back to Poulsbo [*id.*]. Poulsbo attempted to repair the leveling system pursuant to the Thor warranty [86-7 at 45; 86-4 at 33-39]. The Poulsbo repair order reported that the leveling system was lifting all wheels off the ground and not working properly [86-9 PDF 2]. Poulsbo "spoke with [Lippert] several times to diagnose" [*id.* PDF 3]. After determining that the leveling sensor was not properly installed, Poulsbo received a new sensor from Lippert to install [*id.*].

But still the motorhome was not leveling, and the manual calibration mode didn't operate any leveling jacks independently [*id.*]. After further consultation with Lippert, Poulsbo concluded that there was a bad control board that needed to be replaced and needed a new harness [*id.* PDF 4]. At this point, the "system would auto level out of stroke, bringing the wheels off the ground resulting in one bent jack" [*id.*]. After replacing the main control unit and recalibrating the system, Poulsbo tested the leveling system and found it was functioning properly [*id.* PDF 5]. The repair order did not charge the Martins. It coded the work "WDTE"—a code used to indicate that Thor paid for the repair [86-4 at 23-25]. Poulsbo never submitted a claim to Thor, though it may have submitted a warranty claim directly to Lippert [81-1 ¶ 7].

The parties agree that these repairs were completed around January 23, 2019 [86-14 at 6]. Upon picking up the unit, Mr. Martin had the technicians observe the leveling system in action, which resulted in the right rear and front tires being lifted off the ground [81-2 at 47]. A Poulsbo technician tried to explain that this was normal [*id.*], but Kenneth Hurst, Poulsbo's service manager, recalled the Martins' "situation with the leveling system raising the wheels off the ground" was "not common" [86-4 at 9-11]. He could not identify "anything else [Poulsbo] could have done" to try to repair the leveling system [86-4 at 49]. Mr. Martin then brought the unit home where it has since sat unused [81-2 at 47]. The Martins did not pursue a backup cure [81-2 at 39].

STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must present the court with evidence on which a reasonable jury could rely to find in his favor. *Weaver v. Speedway, LLC*, 28 F.4th 816, 820 (7th Cir. 2022). The court must construe all facts in the light most favorable to the non-moving party, viewing all reasonable inferences in that party's favor, *Bigger v. Facebook, Inc.*, 947 F.3d 1043, 1051 (7th Cir. 2020), and avoid "the temptation to decide which

party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003); *see also Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 924-25 (7th Cir. 2020).

In performing its review, the court "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Instead, the "court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.* The court must grant a summary judgment motion when no such genuine factual issue—a triable issue—exists under the law. *Luster v. Ill. Dep't of Corr.*, 652 F.3d 726, 731 (7th Cir. 2011). In a case involving crossmotions, each party receives the benefit of all reasonable inferences drawn from the record when considering the opposing party's motion. *Tegtmeier v. Midwest Operating Eng'rs Pension Tr. Fund*, 390 F.3d 1040, 1045 (7th Cir. 2004).

## DISCUSSION

A.  *Thor's Reconsideration Argument.*

Thor asks the court effectively to reconsider its opinion allowing the failure of exclusive remedy claim to proceed. *See Martin v. Thor Motor Coach Inc.*, 602 F. Supp.3d 1087 (N.D. Ind. 2022). It says this independent UCC-based claim has not been authorized by the legislature and would contravene the UCC adopted in Indiana. It says the court's previous ruling overlooked UCC § 1-103.

Thor might well have been advised to have made that argument before. For today, the answer is simple: its relief lies with either the Indiana General Assembly or the Indiana Supreme Court. Thor never meaningfully grapples with *Kenworth of Indianapolis, Inc. v. Seventy-Seven Ltd.*, 134 N.E.3d 370, 379 n.3 (Ind. 2019) (envisioning a breach of contract action with a separate accrual), or for that matter *Perry v. Gulf Stream Coach, Inc.*, 814 N.E.2d 634, 643-44 (Ind. Ct. App. 2004) (recognizing separate failure of essential purpose claim without naming the cause of action); and both cases house their decision within the UCC and its plain language, as did this court's prior decision. The court isn't writing on a blank slate, and it is outside this court's purview to alter Indiana law.

The UCC must be "liberally construed" to promote its purposes. Ind. Code § 26-1-1-102(1). And principles of law remain in Indiana unless "displaced" by specific provisions of the UCC. Ind. Code § 26-1-1-103. Thor has not cogently explained why either rule of construction directs a different result in a near two-year-old ruling, particularly when Indiana law has recognized independent causes of action for contract and warranty for well longer than that, *see Martin*, 602 F. Supp.3d at 1094-95, when Indiana law expressly envisions a separate claim when a warranty's remedy fails its essential purpose, *see Kenworth*, 134 N.E.3d at 379 n.3; *Perry*, 814 N.E.2d at 643-44, and when the UCC differentiates the types of remedies recoverable for this other claim, *see Martin*, 602 F. Supp.3d at 1095-96.

The court is well aware of the differing views among jurisdictions on this point, and indeed pointed to certain of these in its opinion in 2022. "In short, these cases—one view or the other—offer little that would move the court from its ruling today, given the unique trend of Indiana's courts." *Id.* at 1097. Thor adds to the pile of extra-jurisdictional decisions, but without wrestling with what it must— what Indiana courts have said and done. Calling the Indiana Supreme Court's words "confusing" isn't helpful to understanding Indiana law. The court thus denies summary judgment for Thor on this basis.

B.   *Leveling System Covered by Warranty.*

The court turns to whether the leveling system issues were defects entitled to any remedy. Both sides agree that the leveling jacks were expressly excluded from the operation of any contractual remedy. Thor now argues its warranty meant "leveling system" when it said "leveling jacks" because the RV industry uses the terms interchangeably. But the court cannot rewrite the contract now. *See B&R Oil Co., Inc. v. Stoler*, 77 N.E.3d 823, 829 (Ind. Ct. App. 2017).

A contract's interpretation is generally a question of law, *Song v. Iatarola*, 76 N.E.3d 926, 933 (Ind. Ct. App. 2017), controlled by the parties' intent as expressed by clear contractual language, *City of Jeffersonville v. Env't Mgmt. Corp.*, 954 N.E.2d 1000, 1008 (Ind. Ct. App. 2011). "[W]hen the terms of a contract are drafted in clear and unambiguous language, [the court] will apply the plain and ordinary

meaning of that language and enforce the contract according to those terms." *Haegert v. Univ. of Evansville*, 977 N.E.2d 924, 937 (Ind. 2012). "If a contract is ambiguous, the court may consider extrinsic evidence, and the construction of the contract becomes a matter for the trier of fact." *Song*, 76 N.E.3d at 933.

Although not argued through this precise lens, Thor asks the court to consider usage of trade. This might well require an ambiguity usually; but, within the UCC's context, contractual terms may be explained or supplemented by usage of trade—that is, any practice or method of dealing having such regularity of observance in a trade as to justify an expectation that it will be observed with respect to the transaction in question. *See* Ind. Code §§ 26-1-1-205(3), 26-1-2-202. The UCC does not permit evidence of trade usage to contradict (or to be inconsistent with) a contract term. *See Warrick Beverage Corp. v. Miller Brewing Co.*, 352 N.E.2d 496, 501 (Ind. Ct. App. 1976); *see also Luedtke Eng'g Co. v. Ind. Limestone Co.*, 592 F. Supp. 75, 83 (S.D. Ind. 1983). But the UCC does permit evidence of trade usage to explain a contract term, even if that term has not been found ambiguous. *Warrick Beverage*, 352 N.E.2d at 501 (court should have considered trade usage evidence even when it determined the contract was unambiguous because the evidence did not contradict the terms of the contract).

The court isn't convinced that leveling jacks plainly means leveling system as a matter of law; and, even if susceptible to industry gloss, the record would leave its definition unclear. At the start, a leveling system has many components, including four independent jacks, valves that control the fluid going to the jacks, hoses, electronic components, a sensor, control pad, the power unit harness, the directional valve, the manifold, the presser switch, the quick disconnect, and the retract fitting [86-7 at 12-15; *see also* 86-11 at PDF 5]. According to the system manufacturer (Lippert), when a leveling jack goes bad, it does not require replacement of the whole leveling system [86-7 at 17-18]. Even Thor more narrowly defined "leveling jack" for the consumer in its owner's manual: "A jack lowered from the underside of motorhomes for the purpose of leveling the vehicle. A leveling jack is designed to bear a significant portion of the RV's weight." [86-12]. This usage of trade reasonably suggests that "leveling system" and

"leveling jacks" are not synonymous. In contrast, Thor offers affidavits from a Thor employee and a proposed Rule 702 witness with expertise in the RV industry who use these terms interchangeably and who report the industry's same custom. At most for Thor, these views from the industry would merely underscore the uncertainty in this exclusion's meaning on this record.

Under the MMWA, a warrantor must "fully and conspicuously disclose in simple and readily understood language the terms and conditions of [its] warranty," including "exclusions from the terms of the warranty." 15 U.S.C. § 2302(a)(6); *see also* 16 C.F.R. § 701.3(a)(2) (requiring warrantors to provide a "clear description and identification of products, or parts, or characteristics, or components or properties covered by and where necessary for clarification, excluded from the warranty").[1] This requirement, among others demanded by the MMWA, is designed "to improve the adequacy of information available to consumers, prevent deception, and improve competition in the marketing of consumer products[.]" 15 U.S.C. § 2302(a); *see Richardson v. Palm Harbor Homes, Inc.*, 254 F.3d 1321, 1327 (11th Cir. 2001) ("[o]verwhelming focus of the drafters of the MMWA was dispelling the deceit that was then common in manufacturers' written warranties on new products"). The debate between industry sources on this record merely establishes that this exclusion was indisputably not clear in excluding the entire leveling system rather than just the leveling jacks, much less clear to consumers in the single document that is the Thor warranty. The court thus denies summary judgment for Thor on this basis—the Martins were contractually entitled to a remedy.

C.   *Failure of Essential Purpose of the Warranty's Remedy.*

Now the question is whether they enjoyed such a remedy. Too easily the Martins devolve into a warranty claim that no longer exists. This isn't a case about whether Thor simply breached its warranty

---

[1] Federal courts aren't always bound by the Federal Trade Commission's regulations under the MMWA. *See, e.g., Miller v. Herman*, 600 F.3d 726, 734 (7th Cir. 2010); *Davis v. Southern Energy Homes, Inc.*, 305 F.3d 1268, 1280 (11th Cir. 2002). This circuit has treated the FTC's interpretations under the MMWA as advisory, though has shown them deference when these interpretations address definitions within the MMWA. *See Miller*, 600 F.3d at 734. Here, the regulation echoes the statute.

by not repairing the unit through its authorized dealer, for such a claim is untimely. *See Martin v. Thor Motor Coach, Inc.*, 474 F. Supp.3d 978, 987 (N.D. Ind. 2020); *see also Martin v. Thor Motor Coach, Inc.*, 2021 U.S. Dist. LEXIS 186781, 4 (N.D. Ind. Sept. 29, 2021). There remains only a UCC-based claim as to whether the warranty's remedy in all its forms failed its essential purpose such that the Martins were deprived of any quantum of remedy—what they contracted to receive as part of their purchase—and thus may pursue the UCC's other damages or forms of relief. Once properly framed, this record establishes that no genuine triable issue remains for a jury to decide on this claim.

The parties agree that Indiana law applies. In Indiana, "[t]he essential elements of a breach of contract action are the existence of a contract, the defendant's breach [], and damages." *Berg v. Berg*, 170 N.E.3d 224, 231 (Ind. 2021) (citation omitted). For the sole UCC-based claim that remains, a breach occurs when circumstances cause a warranty's exclusive or limited "remedy" to fail its essential purpose. *Mathews v. REV Recreation Grp., Inc.*, 931 F.3d 619, 622 (7th Cir. 2019) (citing Ind. Code § 26-1-2-719(2)). Indiana law permits buyers and sellers to agree to a limited remedy and indeed a remedy with a series of cures. Ind. Code § 26-1-2-719(1)(a). Such remedial limitations are not favored in Indiana and are strictly construed against the seller. *Martin Rispens & Son v. Hall Farms, Inc.*, 621 N.E.2d 1078, 1085 (Ind. 1993).

A warranty's remedy will rarely fail its essential purpose. *See Rheem Mfg. Co. v. Phelps Heating & Air Conditioning, Inc.*, 746 N.E.2d 941, 954 (Ind. 2001); *Martin,* 602 F. Supp.3d at 1094. It does so when it "operates to deprive either party of the substantial value of the bargain." Ind. Code § 26-1-2-719 cmt. purp. 1. "An agreed remedy does not fail of its essential purpose because it results in the party that bears the risk suffering the risk. Rather, it fails only [when] a party is unfairly deprived of the substantial value of its bargain." *S. Fin. Grp., LLC v. McFarland State Bank*, 763 F.3d 735, 741 (7th Cir. 2014). "Pragmatically, warranties often provide multiple exclusive remedies—for instance, repair, replacement, and *pro rata* refund—so even when one [cure] might fail its essential purpose, others exist to prevent the warranty from being viewed as remedy-less. This is part of [its] rarity in the law." *Martin,* 602 F. Supp.3d at 1094.

Suppose, for instance, that a car comes with a warranty that offers as an exclusive remedy only the options to repair or replace the vehicle. When "attempted repairs [are] ineffective in correcting the problems, the purchaser [is] entitled to recover an amount in excess of the cost of repairs. The exclusive remedy of repair and replacement of defective parts [fails] of its essential purpose because the car could not be repaired so as to operate free of defects as promised in the express warranty." *Martin Rispens*, 621 N.E.2d at 1086 (citations omitted); *accord Sunny Indus. v. Rockwell Int'l Corp.*, 1999 U.S. App. LEXIS 7001, 29 (7th Cir. Apr. 12, 1999) ("unusual for a remedy to fail of its essential purpose, but this typically occurs when a contract's primary remedy is repair or replacement of defective parts, and [it] fails to put the goods in their warranted condition"). Such an exclusive remedy also might fail its essential purpose should the warrantor disavow its contractual obligation or prove "unable or unwilling to repair or replace in a reasonable time." *McFarland State Bank*, 763 F.3d at 741 (citation omitted). In this example, "the buyer loses the benefit of its bargain for the goods"—its contractual right. *Id.*

And why is this so? It is because the parties anticipated and bargained for a repair or replacement of the defective part, but "an unexpected circumstance arises" that prevents both a repair and replacement, and "neither party accepted the risk that such circumstance would occur." *Rheem*, 746 N.E.2d at 955; *see also Martin Rispens*, 621 N.E.2d at 1085 (failure of essential purpose concerns "the application of an agreement to novel circumstances not contemplated by the parties") (quotations and citation omitted); White & Summers, *Uniform Commercial Code* § 13:20 (2020) (same). At that point, the warranty's remedy no longer serves its essential purpose. In analyzing this claim, it thus proves helpful "to identify the purpose underlying the [remedial] provision and determine whether application of the remedy in the particular circumstances will further that purpose." *Martin Rispens*, 621 N.E.2d at 1085. If it will, the remedy has not failed its essential purpose. "If not, then, and only then, is there a failure of essential purpose." *Id.*

In the example thus far, the "remedy" includes only the warrantor's obligation to repair or replace the defective component, not another service provider's chance to repair it or the warrantor's option to refund some portion of the purchase price. Indiana vigorously protects the freedom of parties to contract, *see Hartman v. BigInch Fabricators & Constr. Holding Co.*, 161 N.E.3d 1218, 1220 (Ind. 2021); *Fresh Cut, Inc. v. Fazli*, 650 N.E.2d 1126, 1129 (Ind. 1995), and in doing so the "UCC allows parties to bargain for a limited remedy to serve as an exclusive remedy," *Kenworth*, 134 N.E.3d at 379 (citing Ind. Code § 26-1-2-719(1)(b)). But a warranty that provides layers of a remedy will not fail of its essential purpose merely because one option at a cure might. *See, e.g., Marr Enters., Inc. v. Lewis Refrigeration Co.*, 556 F.2d 951, 955 (9th Cir. 1977) ("if the seller did not replace the defective parts, the purchaser was entitled to refund of the purchase price [so] mere failure to replace or repair would not cause the court to read in the general remedy provisions of the UCC [due to failure of essential purpose]"); *Ritchie Enters. v. Honeywell Bull, Inc.*, 730 F. Supp. 1041, 1049 (D. Kan. 1990) ("backup remedy . . . should blunt the argument that the repair-or-replace remedy has failed of its essential purpose") (citation omitted). "It can become difficult to prove that a warranty's [remedy has] failed [its] essential purpose when the warrantor has many options at a remedy, unless all remedies prove unworkable." *Martin*, 602 F. Supp.3d at 1094.

Therein lies the independent UCC-based claim envisioned by Indiana law, *see Kenworth*, 134 N.E.3d at 379 n.3; *Perry*, 814 N.E.2d at 643-44, and that "makes perfect sense because the remedy that a buyer was promised in contract, but never received, should be redressed in contract when the warranty has proven empty," *Martin,* 602 F. Supp.3d at 1096 (citation omitted); *see also Sunny Indus.*, 1999 U.S. App. LEXIS 7001 at 29 (failure of essential purpose "presupposes the existence of a breach of contract"). "Indiana law contemplates a remedy for a UCC-based claim—phrased in the UCC as some minimum or fair quantum of a remedy." *Id.* at 1094; *see* Ind. Code § 26-1-2-719 cmt. purp. 1. The question here is whether Thor's warranty proved empty in an unexpected circumstance that neither party contemplated

such that it "operates to deprive either party of the substantial value of the bargain." Ind. Code § 26-1-2-719 cmt. purp. 1; *see Rheem*, 746 N.E.2d at 955; *Martin Rispens*, 621 N.E.2d at 1085.

Thor's warranty provides a two-part exclusive and limited remedy: (1) a primary repair right—to repair any covered defects within ten days of discovery if the customer notifies Thor or an authorized dealership of the defect and delivers the motorhome for repair; and (2) a singular backup option when the primary repair fails to cure the defect after a reasonable number of attempts—that is, "to have [Thor] pay an independent service shop of [the buyer's] choice to perform repairs to the defect [or] if the defect is incurable, [to] have [Thor] pay diminished value damages." The essential purpose of the warranty's remedy was to repair the unit by exhausting the skills of more than one repair shop and then, if incurable, the opportunity for Thor to pay the unit's diminished value. The parties so agreed.

The court pauses briefly to address the primary repair—Thor's reserved obligation to repair a covered defect through its authorized dealership within the warranty period assuming the Martins provided notice and at their expense delivered the unit to Thor. A "reasonable opportunity to cure, at least in cases where the defects are somewhat minor, and not affecting full use of the vehicle means at least three chances." *Zylstra v. DRV, LLC*, 8 F.4th 597, 603 (7th Cir. 2021); *accord Mathews*, 931 F.3d at 622 ("Under Indiana law, two chances is not a reasonable opportunity to cure the defects such that the warranty failed of its essential purpose."). Thor says there were only two repair attempts to the leveling system. The Martins argue there were seven. The court finds that Thor undercounts and the Martins overcount; still, this record permits a reasonable jury to say Thor had a reasonable opportunity to cure.

Once again, whether this might give rise to a warranty claim, that untimely claim no longer exists. With an eye toward a claim under *Kenworth*, the parties specifically contemplated that Thor might prove unable to cure a defect after being given a reasonable opportunity to repair it on its own—this was not unexpected but contemplated—so they contracted for a backup cure as part of the warranty's remedy. By its language, this backup cure was part of the "sole and exclusive" remedy; and, as such, resort to it

was not optional but expressly required. *See* Ind. Code § 26-1-2-719(1)(b) ("Resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy."). Indeed, the parties said in their agreement that the backup cure also had to be "exhausted." The Martins needed to exhaust the primary repair right by giving Thor a reasonable opportunity to fix the leveling system, though as buyers they didn't have to "wait indefinitely for the seller to cure." *Anderson v. Gulf Stream Coach, Inc.*, 662 F.3d 775, 783 (7th Cir. 2011). But they then had the obligation, as their exclusive remedy, to choose an independent repair shop so long as the unit could be repaired.

Thor says the Martins never availed themselves of the backup remedy because they never took their recreational vehicle to another repair shop—an independent one of their choosing—after Thor's primary cure faltered with Poulsbo (its authorized dealer). And Thor is indisputably right on this record. The Martins admit they never took the unit elsewhere for work on the leveling system [81-2 at 39]. It seems the unit could be repaired—at most, by installing a new leveling system. Poulsbo could not do this, but the backup remedy afforded the Martins the right to choose an independent shop to perform the repair and to have Thor pay for it. The parties debate whether a lesser repair also may have worked (for example, a hard reset), but they both agree (or leave uncontested) that at most a new system would have repaired the unit. Thor's opinion witness suggests this option at a modest cost [88-1 ¶ 5], and the Martins offer an opinion witness who likewise says the unit must be repaired with a new leveling system (and who assumes a loss appraisal based on the need for one) [86-5 at PDF 14-15, 22; 86-16 at PDF 30-31].

No evidence on this record establishes for a reasonable jury that the unit could not be repaired by installing a new leveling system—that somehow this just wasn't an option on a fully-constructed or used unit. The warranty's remedy that included a backup cure thus would serve its essential purpose, and no reasonable jury could say otherwise. The court need not venture into the argument that the unit's defect was alternatively incurable or address the disjunctive ("or") in the backup cure's language. The court also finds nothing indefinite about the backup cure. The law is rather clear what a reasonable

13

number of opportunities to cure means (for the primary repair remedy), and Poulsbo had exhausted its capabilities. Indeed, the Martins point to its service manager's testimony that there was "nothing else they could have done" to try to repair the unit or its leveling system [86-4 at 49].

To the extent the Martins worried whether Thor would have honored its contract, they could have sought reasonable assurance from the company, else treated Thor's disavowal as an anticipatory breach or repudiation. *See* Ind. Code §§ 26-1-2-609 (permitting written demand for adequate assurance of performance), 26-1-2-610 (authorizing breach remedies for repudiation). Merely assuming this didn't give them the right to sit on their hands and then sue—not when they had an exclusive remedy to exhaust. *See Metro Holdings One, LLC v. Flynn Creek Partner, LLC*, 25 N.E.3d 141, 160 (Ind. Ct. App. 2014); *Ind. Life Endowment Co. v. Carnithan*, 109 N.E. 851, 854 (Ind. Ct. App. 1915). And no reasonable jury could find on this record that their effort would have been impossible (or, though not argued, futile). The Martins haven't presented any evidence to show to a reasonable jury that they requested third-party repairs that Thor refused to cover. Nothing shows that Thor disavowed its obligation under the backup cure or refused to pay for it if an independent shop identified a defect in the leveling system. That Thor declined a reimbursement with Poulsbo cannot be fairly extrapolated to an independent repair shop's work, which may have identified something that Poulsbo overlooked. Thor just was never put to that choice because the Martins gave up without exercising the remedies they agreed were "exclusive."

In short, the Martins cannot establish for a reasonable jury that the essential purpose of the warranty's exclusive remedy—to afford a repair through different repairers—was unworkable in all its forms such that the warranty's remedy failed that purpose or that the parties lost the benefit of their bargain by confronting a novel circumstance. *See Rheem*, 746 N.E.2d at 955; *Martin Rispens*, 621 N.E.2d at 1085. A cure could have been had, and the warranty's remedy would have served its purpose. *See Martin Rispens*, 621 N.E.2d at 1085. It is precisely what the Martins contracted to receive; they just never exercised their right to it. The Martins cannot sue in contract or through the MMWA for something they got. *See*

14

*id.*; *see also Mathews*, 931 F.3d at 622 ("limited warranty did not fail in its essential purpose because the Mathews did not avail themselves of the contract's back-up remedy"); *Raymond v. Thor Motor Coach, Inc.*, 2023 U.S. Dist. LEXIS 134020, 17 (N.D. Ind. Aug. 2, 2023) (same); *accord Sunny Indus.*, 1999 U.S. App. LEXIS 7001 at 29 (no failure of essential purpose "merely because a [buyer] is not contractually entitled to the remedy of [his] choice," nor "because one party struck a bad bargain that it later regrets"). The court thus grants summary judgment for Thor.

## CONCLUSION

Accordingly, the court STRIKES Exhibit O [86-15], GRANTS Thor's summary judgment motion [79], DENIES the Martins' partial summary judgment motion [84], and DENIES AS MOOT the motion for video attendance at final pretrial conference [90].[2] The court directs the clerk to enter judgment for Thor. This order terminates the case.

SO ORDERED.

February 21, 2024                              *s/ Damon R. Leichty*
                                               Judge, United States District Court

---

[2] Thor moved to strike Exhibit O [86-15]—a post-suit email between counsel from December 2019 discussing a settlement offer. The Martins never respond to explain why this exhibit is appropriately considered. Rule 408 makes "conduct or statements made in compromise negotiations" regarding a claim inadmissible "when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount." Rule 408 is "inapplicable," however, when "compromise evidence is offered for a purpose other than to prove the validity, invalidity, or amount of a disputed claim." Fed. R. Evid. 408 advis. comm. note (2006); *see also Zurich Am. Ins. Co. v. Watts Indus.,* 417 F.3d 682, 689 (7th Cir. 2005). The Martins offer this exhibit for an inadmissible purpose [88 ¶ 61], and this exhibit otherwise has no bearing on today's case, so the court strikes Exhibit O from the record.